## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUPRA TELECOMMUNICATIONS AND ) | |
| INFORMATION SYSTEMS, INC. ) | |
| 2901 SW 149th Ave., Suite 300 ) | |
| Miramar, FL 33027 ) | Case No. _____ |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| AT&T CORP., ) | |
| 1 AT&T Way ) | |
| Bedminster, New Jersey 07921 ) | JURY TRIAL REQUESTED |
| ) | |
| AT&T COMMUNICATIONS, INC., ) | |
| 1 AT&T Way ) | |
| Bedminster, New Jersey 07921, ) | |
| ) | |
| AND DOES 1-20, ) | |
| ) | |
| Defendants. ) | |

### Complaint

Plaintiff Supra Telecommunications and Information Systems, Inc. ("Supra" or

"Plaintiff"), for this complaint against defendants AT&T Corp., AT&T Communications, Inc.,

and DOES 1-20 (collectively "AT&T"), alleges as follows:

### NATURE OF THE ACTION

1.      This case involves AT&T's failure to pay legally required charges for its use of

Plaintiff's local network facilities to receive and complete long-distance calls.  Whenever one of

AT&T's long-distance customers makes a long-distance call to one of Plaintiff's local telephone

customers, AT&T uses the Plaintiff's local facilities to complete, or "terminate," the AT&T

long-distance call.  Similarly, whenever one of AT&T's long-distance customers uses a local

telephone line provided by Plaintiff to place a long-distance call, AT&T uses the Plaintiff's local

- 1 -

facilities to "originate" the long-distance call.  Pursuant to Plaintiff's federal and state tariffs on

file with the Federal Communications Commission ("FCC") and state regulatory authorities,

AT&T is required to pay Plaintiff for this "originating" and "terminating" "access" to Plaintiff's

local exchange facilities.

      2.      Beginning in or around 2000 and continuing through the present, AT&T

orchestrated and implemented at least two fraudulent schemes in an attempt to avoid some of

Plaintiff's "access charges" (along with access charges of numerous other carriers), as described

herein.

      3.      The FCC has twice rejected AT&T's supposed bases for failing to pay access

charges to local carriers such as Plaintiff, in orders released in April 2004 and February 2005.[1]

Rather than award damages, however, the FCC instructed carriers damaged by AT&T's violation

of access charge requirements to seek recovery in court.

      4.      Particularly in light of these FCC decisions, AT&T has no excuse for its failure to

pay lawfully tariffed access charges.  Accordingly, Plaintiff seeks to recover the access charges

that AT&T has unlawfully failed to pay and to enjoin AT&T from continuing its unlawful

conduct.

## JURISDICTION AND VENUE

      5.      This is in significant part a collection action for payments arising under section

203 of the Communications Act of 1934, 47 U.S.C. § 203, and Plaintiff's interstate access tariff

filed thereunder.  This Court accordingly has jurisdiction over this action pursuant to 28 U.S.C.

---

[1]   *See Petition for a Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services are Exempt from Access Charges,* 19 F.C.C.R. 7457 (2004) ("*FCC Access Charge Order*"), *and AT&T Corp. Petition for Declaratory Ruling Regarding Enhanced Prepaid Calling Card Services,* WC Docket Nos. 03-313 and 05-68, Order and Notice of Proposed Rulemaking, FCC 05-41, 20 F.C.C.R. 4826 (Feb. 23, 2005) ("*FCC AT&T Calling Card Access Charges Order*").

§§ 1331 and 1337 and 47 U.S.C. § 207. In addition, since AT&T is a common carrier, Plaintiff's claims also arise under section 206 of the Communications Act of 1934, 47 U.S.C. § 206. This Court has jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

6.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b), as AT&T has agents and transacts business in this district.

## ALLEGATIONS COMMON TO ALL COUNTS

## PARTIES

7.    Plaintiff is a Florida corporation and is a competitive local exchange carrier ("CLEC") providing local telephone and other telecommunications services in Florida and New York. In 1999, Plaintiff changed its name from Supra Telecom Inc. to Supra Telecommunications and Information Systems Inc. and Plaintiff remains the successor in interest to Supra Telecom Inc. Plaintiff's principal place of business is at 2901 SW 149th Ave., Suite 300, Miramar, FL 33027.

8.    AT&T Corp. is a New York corporation with its principal place of business at 1 AT&T Way, Bedminster, New Jersey, 07921. AT&T Corp. provides, among other things, telecommunications services throughout the United States, including in the District of Columbia. AT&T Corp. can be served with process by serving its registered agent for service of process: CT Corporation System, 1015 15th Street, N.W., Suite 1000, Washington, D.C. 20005.

9.    AT&T Communications, Inc. is a wholly owned subsidiary of AT&T Corp. AT&T Communications, Inc., with its principal place of business at 1 AT&T Way, Bedminster, New Jersey 07921, can be served with process by serving its registered agent for service of process: CT Corporation System, 1015 15th Street, N.W., Suite 1000, Washington, D.C. 20005.

10.     The true names and roles of defendants DOES 1-20, inclusive, are unknown to Plaintiff, which accordingly sues those defendants by fictitious names.  Plaintiff believes and alleges that each of the DOE defendants is legally responsible in some manner for the events alleged in this Complaint and the resulting injury and damages caused to Plaintiff.  Plaintiff will amend the Complaint to reflect the true names and roles of the DOE defendants when Plaintiff obtains that information.

11.     AT&T Corp. and its affiliates listed above, which are collectively referred to as "AT&T" throughout this complaint, effectively operate as a single enterprise.  AT&T has complete control and influence over these subsidiaries.  This control and influence includes, among other things, all decisions regarding the services AT&T's subsidiaries provide, the facilities they use, the traffic sent over those facilities, the agreements into which they enter, and the way they market and sell their service.  AT&T coordinates and controls one overarching position concerning all of these issues from its corporate headquarters.  AT&T and all of its subsidiaries also operate as a single integrated operation, under a nationwide brand.  AT&T has used each of these subsidiaries, individually and collectively, as a subterfuge to assist AT&T in conducting and perpetuating fraud.  In particular, AT&T has used these subsidiaries to conceal AT&T's interexchange traffic so that AT&T could avoid paying Plaintiff's lawfully tariffed access charges.  AT&T routed interexchange traffic over facilities that these subsidiaries had previously obtained for the express purpose of terminating primarily local traffic with Plaintiff and other LECs.  This enabled AT&T to disguise its interexchange traffic from Plaintiff and other LECs, and, consequently, to avoid being billed access charges for this traffic.  For the foregoing reasons, the subsidiaries listed above constitute alter egos of AT&T Corp.

**BACKGROUND**

The Access Charge Regime

12.    This action centers on AT&T's non-payment for switched access charges owed to Plaintiff in accordance with Plaintiff's lawful tariffs. Access charges are the fees that long-distance carriers such as AT&T must pay local exchange carriers such as Plaintiff to defray the costs associated with the use of local exchange facilities for originating and terminating long-distance calls. These switched access charges are established and mandated by federal and state regulations and tariffs, which are described in detail below.

13.    Since the breakup of the Bell System in 1984, local exchange carriers ("LECs"), such as Supra, and long-distance carriers, such as AT&T, have played largely distinct roles in the telecommunications industry. LECs have primarily carried local calls – i.e., calls between end users located within local calling areas or exchanges. Long-distance carriers have traditionally carried calls between exchanges, on both an intrastate and interstate basis. This long-distance service is known as "interexchange" service.

14.    In order to provide long-distance interexchange service, carriers such as AT&T typically establish one or more points of presence (POPs) within a given area. POPs are facilities that provide a point of interconnection between local exchange networks and interexchange networks. When a customer makes an interexchange call, that customer's local exchange carrier transports the call over the local exchange carrier's network to the POP of the long-distance carrier that the customer has selected (say, AT&T). The long-distance carrier then transports the call from the POP in the area where the calling party is located (i.e., where the call originates) to the POP in the area where the called party is located (i.e., where the call

terminates).  The called party's local exchange carrier then receives the call from the long-distance carrier, either directly or through an intermediary, and delivers it to the called party.

15.    The transmission of an interexchange call from the calling party to  a  long-distance carrier's POP is known as "originating access."  The transmission of an interexchange call from  a long-distance carrier's POP to the called party is known as "terminating access."

16.    Federal and state tariffs dictate the appropriate originating and terminating access charges that apply to a given interexchange call, depending on whether the call is interstate or intrastate.  If the call originates in one state and terminates in another, the access charges that apply are set forth in interstate tariffs filed with the FCC.  If the call originates and terminates within the same state, the access charges that apply are set forth in intrastate tariffs filed with individual state regulatory commissions.

17.    For historical and regulatory reasons beyond the scope of this Complaint, most LECs' intrastate access charges are often higher (in many cases, considerably so) than interstate access charges.

18.    Local telephone calls between a customer of Plaintiff and another local exchange carrier are not subject to access charges, but are subject to a different regulatory regime, called "reciprocal compensation."  Under reciprocal compensation, the parties exchanging local traffic either agree on the rate at which the carriers bill each other for termination of each other's local traffic (typically much lower than access charges) or the parties assume a relative balance of traffic and agree to an arrangement termed "bill and keep" in which no payments are exchanged between the carriers; rather carriers recover the costs of terminating traffic from their own customers.

19.     Plaintiff provides service over the majority of its local telephone lines using switching capability leased from an incumbent local exchange carrier (ILEC). The rates Plaintiff pays to lease switching capacity from the ILECs are premised in part upon the design that Plaintiff, rather than the ILEC, will bill and collect access charges from long-distance carriers such as AT&T.

20.     In most instances, long-distance traffic destined for Plaintiff's customers is delivered by the long-distance carrier, or another carrier acting on its behalf, to the ILEC's network, which routes the calls to Plaintiff's customers.

21.     When terminating calls to a local carrier, AT&T is required to provide information that permits the ultimate terminating carrier to determine the jurisdictional nature of the call. This information enables Plaintiff to assess and bill the appropriate interstate and intrastate terminating access charges to AT&T.

### AT&T's Obligations to Pay Access Charges to Plaintiff

22.     During the entire relevant period, Plaintiff has offered switched access charges pursuant to tariffs filed with the FCC (for interstate access services), the Florida Public Service Commission ("FPSC") and the New York Public Service Commission (for intrastate access services). The provisions of these tariffs are binding on AT&T and govern the rates, terms and conditions that Plaintiff may offer switched access services.

23.    Beginning in approximately 1999, a dispute arose between Plaintiff and AT&T regarding AT&T's obligation to pay switched access charges under Plaintiff's federal and state switched access tariffs.  AT&T claimed that the charges set forth in these tariffs were excessive and refused to pay them, although it continued to use Plaintiffs' access services.  AT&T and Plaintiff settled this dispute on December 21, 2002.  AT&T agreed to partially settle its dispute with Plaintiff by paying an agreed amount for switched access services rendered by Plaintiff through December 21, 2002.  Other amounts Plaintiff billed AT&T for switched access remained in dispute subsequent to the December 21, 2002 settlement.  AT&T has paid the amount required under the settlement, and there is no dispute between AT&T and Plaintiff for unpaid switched access service charges rendered to AT&T prior to December 21, 2002 that are covered by the December 21, 2002 settlement, except, to the extent that, as explained below, AT&T defrauded Plaintiff.  Because this dispute was settled after Supra had filed a Voluntary Petition for Relief Under Chapter 11 of Title 11 of the United States Bankruptcy Code, the United States Bankruptcy Court for the Southern District of Florida approved the settlement agreement on February 26, 2003.[2]

### AT&T's Evasion of Interstate and Intrastate Access Charges

24.    Beginning in or around 1999, AT&T began disguising long-distance interexchange calls it delivered to Plaintiff and other LECs, thereby preventing Plaintiff from detecting the interexchange nature of the calls and enabling AT&T to avoid being billed for the lawfully tariffed access charges that apply to such calls.  For example, AT&T repeatedly disguised interstate and intrastate long-distance calls as local calls, and in other cases disguised

---

[2]    *In re Supra Telecommunications and Information Systems, Inc.*, Order Granting Debtor's Emergency Motion to Approve Settlement Agreement with American Telephone And Telegraph, Inc., Case No. 02-41250, Feb
(Cont'd)

intrastate long-distance calls as interstate. AT&T disguised calls by concealing, changing,

causing to be concealed or changed, or otherwise misrepresenting the originating telephone

number transmitted with the call, and by materially misrepresenting other information provided

to Plaintiff. The information AT&T concealed, changed and/or misrepresented is information

that is essential to the Plaintiff's ability to identify whether calls are interexchange in nature and,

if so, whether they are local, interstate long-distance or intrastate long-distance calls.

25.    By design, AT&T's improper call-termination scheme prevented Plaintiff from

distinguishing between local traffic and interexchange traffic. Plaintiff was thus unable to bill

for (or even to detect or measure) a great deal of interexchange voice traffic that AT&T delivered

to Plaintiff for termination. Therefore, Plaintiff could not reasonably have been expected to

determine AT&T's actual use of their access services and bill AT&T the appropriate charge.

26.    AT&T disguised, as described in paragraph 24 above, a substantial portion of its

long-distance calls, apparently based upon the incorrect premise that the calls were not subject to

access charges because they used Internet Protocol ("IP") for an intermediate portion of its

transmission between AT&T POPs.

27.    IP is a technology that was originally developed for use in connection with the

public Internet. Because IP is so efficient at carrying traffic, however, many carriers, including

AT&T, have been implementing it on their private networks as well. And, although IP was

originally developed to carry data traffic generated by computers, technological advances over

the past several years have made it possible to use IP to transmit ordinary voice traffic as well.

28.    In this respect, IP technology is simply the latest in an array of transmission

technologies used to transmit ordinary telephone calls from one point to another. Some carriers

---

26, 2003.

use microwave transmission, others use fiber-optic cables, others use satellites, and still others continue to use the copper wires that have been in use for decades. As the FCC has recognized, the mere choice of transmission technology makes no difference to the regulatory classification of a telephone call or the applicability of access charges. Instead, under the Communications Act of 1934, 47 U.S.C. § 151 *et seq.*, "telecommunications" is defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43). Thus, under the Act and the FCC's long-standing rules, provided that the call begins and ends as an ordinary, circuit-switched telephone call, the technology a carrier elects to use to facilitate its transmission is irrelevant for purposes of access charges.

29.     In order for a long-distance carrier to use an Internet backbone in the transmission of ordinary long-distance voice traffic, it must perform what is known as a "protocol conversion" on *both* ends of the call. For example, in the case of an AT&T long-distance subscriber in New York making a call to Washington, DC, the call (1) originates on the network of a local exchange carrier in New York as an ordinary telephone call, (2) is handed off to AT&T in that format, (3) is converted by AT&T into the IP format, (4) is transmitted by AT&T in the IP format on its Internet backbone for some distance between New York and Washington (although not necessarily the entire distance), (5) is converted back into an ordinary telephone call by AT&T or a party acting on its behalf, (6) is handed to the local exchange carrier in Washington in that format, and (7) is delivered to the called party in Washington by the local carrier.

30.     In this scenario, neither the calling party in New York nor the called party in Washington has any idea that their call has been converted to the IP format in the middle. The

transmission of the call, between or among points specified by the user, is dialed and received in the same manner as any other long-distance call, and AT&T's service offers nothing more than the transmission of information of the user's choosing, without a net change in the form or content of the information as sent and received. In fact, although AT&T has been performing these protocol conversions and using IP to transmit an increasing portion of its customers' long-distance telephone calls, it has continued to bill its customers for these calls as ordinary long-distance calls, it has not informed them that these protocol conversions were taking place, and it has *not* stopped paying LECs the *originating* access charges that apply to these calls. By paying LECs the originating access charges on the IP in the middle format calls, AT&T acknowledged that they were switched access calls.

31.    AT&T did, however, avoid paying *terminating* access charges for calls that it transmits using IP, by disguising those calls as local calls on the terminating end. As noted above, a long-distance call that AT&T transmits using IP is no different than a long-distance call using any of the other transmission technologies noted above, and the terminating LEC performs the same functions over the same facilities to deliver that call to the called party. In fact, the terminating LEC ordinarily would not even be aware of whether an interexchange call it receives from AT&T is transmitted using IP within AT&T's network, provided it is converted back into an ordinary telephone call before it is delivered to the terminating LEC.

32.    In addition to its misclassification of calls using IP, AT&T, as described in paragraph 24 above, disguised certain intrastate (in-state) prepaid calling card long-distance calls as interstate calls (which are in most cases subject to lower access charges), when in fact the calling and called parties were located in the same state, purportedly based on the incorrect premise that the calls were not subject to intrastate originating and terminating access charges

- 11 -

because AT&T routed the call through its 8YY (i.e., 800-number) platform in another state. In other cases, AT&T disguised interstate and intrastate prepaid calling card calls so at to avoid being billed for access charges altogether.

33.    AT&T later attempted to justify this ruse by claiming that when a customer using such a card places a call to someone in the same state, the call would be considered interstate because it consists of two calls, one between the caller and the AT&T platform delivering the recorded advertisement and one between that platform and the called party, and that at least one of those "calls" is interstate.

34.    AT&T pursued both the IP and calling card access-avoidance schemes surreptitiously for several years. Then, in the wake of several criminal prosecutions of companies that had unlawfully evaded lawfully tariffed access charges,[3] AT&T sought to cloak its behavior with the imprimatur of the FCC. Specifically, in October 2002, AT&T filed a petition with the FCC requesting that the FCC declare that a telephone call converted to IP, carried on an Internet backbone, and then converted back to an ordinary telephone call for termination was exempt from access charges.[4] Then, in May 2003, AT&T filed another petition with the FCC requesting that the FCC declare that AT&T's prepaid calling card services as

_____

[3]    In 2001, the Department of Justice prosecuted NTS Communications and two of its officers for defrauding Ameritech and AT&T's local service affiliate by operating long-distance companies which "concealed the true nature" of the long-distance traffic they delivered for termination, and by characterizing that traffic instead as local. *See* Indictment, *United States v. Lacy Ward, et al.,* Case No. IP01-CR-0079-01-04-B/F (S.D. Ind. filed Jul. 11, 2001). The defendants pleaded guilty to conspiracy to commit wire fraud and were sentenced to prison and restitution for "perpetrating a scheme that defrauded Southwestern Bell Telephone of millions of dollars in [access] fees." Press Release, *Long Distance Provider NTS Communications, Inc. and Two Executives are Charged with Defrauding Southwestern Bell Telephone of Millions in Long Distance Usage Fees, U.S.* Dep't of Justice, Feb. 28, 2002.

[4]    *See Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services Are Exempt from Access Charges, WC* Docket No. 02-361 (FCC filed Oct. 18, 2002).

described above be deemed jurisdictionally interstate and therefore exempt from intrastate access charges.

35.    AT&T did not, however, wait for the FCC to rule on its petitions. Instead, even while its petitions were pending and unbeknownst to Plaintiff, AT&T continued its practice of improperly terminating long-distance calls to Plaintiff and other LECs in a manner designed to evade the Plaintiff's and other LECs' detection of the interexchange, and interstate and intrastate, nature of the calls and to avoid access charges on massive amounts of traffic.

36.    Ultimately, the FCC unanimously rejected both of AT&T's petitions. First, on April 21, 2004, the FCC declared that, under its longstanding existing rules, the conversion of ordinary telephone traffic to IP and back again has no effect on the regulatory classification of the telephone call. The FCC further held that AT&T is required to pay access charges for *all* interexchange voice traffic that originates and terminates over circuit-switched local exchange networks, including traffic that is converted to IP and transmitted over AT&T's Internet backbone at some point in the middle before being reconverted to be delivered to a local carrier. The FCC accordingly authorized local telephone companies to pursue collection actions such as this one against AT&T for access charges that AT&T had failed to pay based on its unlawful scheme.

37.    Then, on February 23, 2005, the FCC held that AT&T's prepaid calling card calls between callers located in the same state are intrastate telecommunications services subject to intrastate access charges, under the same "end to end" analysis that the Commission had applied to other calling card and other telecommunications services for many years. As in its April 21, 2004 order, the FCC again instructed local exchange carriers that claims for unpaid access charges be filed with an appropriate court or state commission rather than brought to the FCC.

38.     Until it filed the petitions with the FCC described in paragraph 34, above, AT&T fraudulently concealed its schemes to avoid access charges.  Even when it filed these petitions, AT&T fraudulently misrepresented the extent to which it was engaging in such schemes.

39.     Even after these FCC decisions, AT&T has continued to engage in practices to prevent Plaintiff's detection of the interexchange, and interstate and intrastate, nature of calls and thereby attempt to avoid access charges, but apparently on a lesser scale.

40.     Particularly in light of these FCC's decisions, AT&T has no excuse for continuing its scheme and its failure to pay Plaintiff access charges for long-distance calls in accordance with Plaintiff's federal and state tariffs.

## COUNT I
### (BREACH OF FEDERAL TARIFF)

41.     Plaintiff incorporates by reference as though fully set forth herein the allegations of preceding paragraphs of this Complaint

42.     Plaintiff's rates and terms for interstate access charges for long distance calls are set forth in Supra Telecom Inc. Tariff F.C.C. No. 1 ("Federal Tariff"), as filed with the Federal Communications Commission.

43.     The above-referenced federal tariff requires AT&T to pay the tariffed access charges for both originating access and terminating access.

44.     Plaintiff fully performed its obligations under its Federal Tariff, except for those it was prevented from performing, those it was excused from performing, or those that were waived by AT&T's misconduct as alleged herein.

45.     AT&T failed to pay Plaintiff for interstate switched access services in accordance with the Federal Tariff.

46.    AT&T materially violated Plaintiff's Federal Tariff by failing to pay the tariffed rates for the services it used.

47.    For the reasons set forth above and in the *FCC Access Charge Order*, pursuant to Plaintiff's lawful Federal Tariff, AT&T is liable to Plaintiff for its failure to pay interstate access charges on interstate interexchange traffic that AT&T delivered to Plaintiff for termination.

48.    Plaintiff has been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## COUNT II
### (BREACH OF STATE TARIFFS)

49.    Plaintiff incorporates by reference as though fully set forth herein the allegations of preceding paragraphs of this Complaint.

50.    Plaintiff's rates and terms for intrastate access charges are set forth in Supra Telecommunications and Systems, Inc.[5] Florida Price List No. 2, as filed with the Florida Public Service Commission, and its New York access tariff, Supra Telecom Inc. New York PSC No. 3.

51.    The tariffs referenced above provide, among other things, that AT&T must pay Plaintiff's intrastate access charges for both originating access and terminating access.

52.    Plaintiff fully performed its obligations under the tariffs referenced above, except for those it was prevented from performing, those that it was excused from performing, or those that were waived by AT&T's misconduct as alleged herein.

---

[5]    There is no separate Supra entity with the name Supra Telecommunications and Systems Inc. There is a typographical error in the name of the tariff and it should read Supra Telecommunications and Information Systems, Inc.

53.    AT&T materially violated the tariffs referenced above by failing to pay the tariffed rates for the services it used.

54.    For the reasons set forth above and in the *FCC Access Charge Order and FCC AT&T Calling Card Access Charges Order,* AT&T is liable to Plaintiff for its failure to pay intrastate access charges on intrastate interexchange traffic that AT&T delivered to Plaintiff for termination.

55.    Plaintiff has been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

### COUNT III
(UNFAIR AND DECEPTIVE TRADE PRACTICES)

56.    Plaintiff incorporates by reference as though fully set forth herein the allegations of preceding paragraphs of this Complaint.

57.    AT&T's misrepresentations and omissions, which were used to avoid legitimate switched access charges, were unfair and deceptive acts and omissions affecting commerce.

58.    AT&T deceived Plaintiff by disguising intrastate traffic as interstate traffic, and disguising long-distance (either intrastate or interstate) traffic as local traffic, and unfairly received services without paying the proper rates.

59.    AT&T's unfair and deceptive acts violate Fla. Stat. §501.201 *et seq.*

60.    Plaintiff is entitled to treble damages and attorneys fees resulting from AT&T's violation of this statute.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

### COUNT IV (in the alternative)
(UNJUST ENRICHMENT)

- 16 -

61.    Plaintiff incorporates by reference as though fully set forth herein the allegations of preceding paragraphs of this Complaint.

62.    For the reasons set forth above and in the *FCC Access Charge Order and FCC AT&T Calling Card Access Charges Order,* pursuant to Plaintiff's federal and state tariffs, AT&T is liable to Plaintiff for its failure to pay interstate and intrastate access charges on interexchange traffic that AT&T delivered to Plaintiff for termination. This Count IV is pleaded solely in the alternative, in the unlikely event the tariffs are determined not to apply to every instance of AT&T's alleged conduct. In no way is this Count IV to be construed as an admission that Plaintiff's tariffs do not govern this case.

63.    By terminating interexchange calls carried by AT&T to Plaintiff's local telephone customers, Plaintiff permitted AT&T's long-distance subscribers to complete long-distance calls to Plaintiff's customers. Plaintiff thereby conferred a benefit on AT&T.

64.    AT&T understood that the termination of interexchange calls by Plaintiff was important to AT&T's long-distance customers, and it accordingly appreciated and recognized that Plaintiff's termination of interexchange calls carried by AT&T was a benefit to AT&T.

65.    AT&T unjustly accepted and retained the benefit of Plaintiff's call termination services without providing legally required compensation to Plaintiff.

66.    Plaintiff has been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## COUNT V
### (FRAUD)

67.    Plaintiff incorporates by reference as though fully set forth herein the allegations of preceding paragraphs of this Complaint.

68.     AT&T committed fraud against Plaintiff. Specifically, AT&T knowingly, and with the intent to defraud, made or caused to be made misrepresentations and omissions of material facts, including, but not limited to the following:

(a)   AT&T made public statements that sought to falsely minimize the volume of interexchange traffic that it was delivering to Plaintiff and other local exchange carriers for termination without payment of the appropriate access charges;

(b)   AT&T disguised long-distance calls placed by AT&T customers to Plaintiff's local customers by concealing, changing, causing to be concealed or changed, or otherwise misrepresenting the originating telephone number transmitted with the call, and by misrepresenting other information provided to Plaintiff, all of which was essential to Plaintiff's ability to properly identify calls as interstate and intrastate interexchange calls;

(c)   AT&T provided Plaintiff with false and incorrect information as to the relative percentages of interstate long-distance, intrastate long-distance, and local calls that AT&T delivered to other carriers to be delivered to Plaintiff; and

(d)   AT&T failed to put Plaintiff on notice with specificity of its practice of avoiding access charges for interexchange traffic, or of the extent to which AT&T adopted and employed this practice.

69.     These misrepresentations and omissions were false and misleading at the time they were made.

70.    AT&T made each of these misrepresentations and/or omissions with knowledge of their falsity or recklessly without regard for their truthfulness as a positive assertion, with the intent to deceive Plaintiff, and with the intent to induce Plaintiff to act in the manner herein alleged.

71.    Indeed, on a daily basis through the time period relevant to this Complaint, AT&T represented to its customers (but not to Plaintiff), in bills and otherwise, that the interexchange calls that it delivered to Plaintiff were in fact long-distance calls because it billed them long distance rates.

72.    Moreover, with respect to its IP-in-the-middle scheme, AT&T paid at least hundreds of millions of dollars in originating access charges on the same calls that it disguised on the terminating end. Any claim by AT&T that it did not know that terminating access charges were due on these IP based calls is contradicted by the fact that it paid the originating access charges on at least many of the same calls without disputing the bills it received for originating access charges. AT&T knew that these calls were long distance calls that were subject to access charges. It paid the originating access charges because in most cases it had no way to conceal the nature of these calls from the LECs providing originating access.

73.    Plaintiff was, in fact, deceived by AT&T's misrepresentations and omissions.

74.    Plaintiff reasonably and justifiably relied to its detriment on AT&T's misrepresentations and omissions. Plaintiff had no reason to believe that AT&T was engaging in trickery to avoid paying terminating access charges on such calls. Due to AT&T's fraudulent conduct, Plaintiff were unable to bill for (or even to detect or measure) the interexchange traffic that AT&T terminated on Plaintiff's local network, and Plaintiff was unable to ascertain the volume of interexchange traffic that AT&T was delivering for termination without payment of

access charges.  The truth about the scope of AT&T's unlawful conduct accordingly remained within the peculiar knowledge of AT&T, which engaged in deceptive acts calculated to mislead and thereby obtain an unfair advantage.

75.    Plaintiff was damaged as a direct and proximate result of AT&T's misrepresentations and omissions in an amount to be determined at trial.  Such damages include, but are not limited to, the following:

(a)   The access charges that AT&T avoided paying;

(b)   The additional costs to Plaintiff since discovery of AT&T's scheme of using complex and costly methods to determine and prove the amount of access charges that AT&T avoided through its fraudulent scheme; and

(c)   The opportunity cost of the delay in receiving funds at a time when capital was scarce for competitive local exchange carriers such as Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court grants relief for all misconduct as follows:

(a)   Money damages to be proven at trial, plus prejudgment interest;

(b)   treble damages;

(c)   punitive damages;

(d)   restitution;

(e)   all costs and attorney's fees incurred by Plaintiff;

(f)   preliminary and permanent injunctive relief enjoining defendants from continuing to engage in the fraud complained of;

(g)  a full accounting of the number of interexchange minutes improperly sent to be terminated by each Plaintiff as local traffic;

(h)  a full accounting of the number of interexchange minutes on calls where the caller and the ultimate called party were in the same state, sent by AT&T to be terminated by each Plaintiff on which AT&T did not pay an intrastate access charge;

(i)  indemnification for claims that have been or may be asserted and damages that have been or may be sought by third parties arising in whole or in part from AT&T's wrongful conduct; and

(j)  such further relief as this Court deems appropriate and just.

### JURY DEMAND

Plaintiff hereby requests a jury trial on all issues and claims.

September 8, 2005                                          Respectfully submitted,

Eric J. Branfman (D.C. Bar No. 164186)
Joshua M. Bobeck (D.C. Bar No. 443620)
Anitra D. Goodman (D.C. Bar No. 484434)
SWIDLER BERLIN LLP
3000 K Street, NW, Suite 300
Washington, DC 20007
202-424-7500

**ATTORNEYS FOR PLAINTIFF**